# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **WAYNE ORKIN** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil No. 4:21-cv-40060-MRG** |
| ) | |
| **LISA SUE ALBERT** ) | |
| ) | |
| **Defendant** ) | |
| ) | |
| **and** ) | |
| ) | |
| **BOOST WEB SEO, INC.** ) | |
| ) | |
| **Intervenor-Plaintiff** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **WAYNE ORKIN** ) | |
| ) | |
| **Intervenor-Defendant.** ) | |
| ) | |

## AMENDED MEMORANDUM OF DECISION

**GUZMAN, J.**

After several claims were dismissed at summary judgment, Plaintiff Wayne Orkin ("Wayne") brought various state law claims against his sister, Lisa Albert ("Lisa"), to trial. The remaining claims at trial included defamation (Count II), breach of fiduciary duty (Count IV), breach of contract (Count VI), unjust enrichment (Count VIII), and injunctive relief (Count IX). Additionally, Intervenor-Plaintiff, Boost Web SEO, Inc. ("Boost Web"), brought a conversion claim against Intervenor-Defendant, Wayne Orkin. All claims were heard at a bench trial, which commenced on August 1, 2023. After three days of trial, Wayne rested his case and the Court *sua*

*sponte* made a judgment on partial findings in favor of Lisa under Rule 52(c) of the Federal Rules of Civil Procedure. The bench trial continued as to Boost Web's conversion claim, concluding after two more days of testimony. The Court took the intervenor claim under advisement. This memorandum and order sets out the Court's rulings in these two cases.

As a preliminary matter, the Court is selective in its reproduction of the record, condensing the most salient pieces of information and deemphasizing those facts that are not as germane to this Court's conclusions. The following findings are drawn from the evidence and testimony adduced at trial, the parties proposed findings of fact and conclusions of law,[1] as well as from the parties' stipulations entered prior to trial.

*   *   *

## PRINCIPAL CASE: WAYNE ORKIN'S CLAIMS AGAINST LISA ALBERT

### A.    PRINCIPAL FINDINGS OF FACT ("PFF")

#### A.I.    THE PARTIES AND KEY PLAYERS

1.  Wayne Orkin and Lisa Albert are the children of Arthur Orkin, now deceased. (Trial Tr. Day 1 47:21-48:1). Ian Albert is Lisa Albert's son. (Trial Tr. Day 1 48:4-9).

2.  Boost Web is a Florida corporation specializing in search engine optimization, and merchant credit card processing. (Joint Pre-Trial Mem. Undisputed Facts, ECF No. 160, ("Undisputed Facts") ¶ 3).

3.  Pass Thru Merchant Services ("PTMS") was a business that Wayne owned which, prior to 2014, earned residuals from credit card transactions processed by Financial Transaction

---

[1] The Court draws on the parties' proposed findings of fact and conclusions of law that were submitted for the Intervenor-Plaintiff's case, but only to the extent that such materials refer to facts in evidence prior to the close of Wayne's primary case.

Services, LLC ("FTS" and later known as "CardConnect"). (Trial Ex. 2; Undisputed Facts ¶¶ 10, 11).

### A.II.   **BOOST WEB'S FORMATION**

4. Boost Web was formed when Wayne resided in the Dominican Republic and he needed a United States corporation to receive payments from Boost Web customers and residuals from CardConnect. (Trial Tr. Day 1 187:11-18; Day 2 11:17-25).

5. Wayne bought the Boost Web website in 2012. Lisa incorporated Boost Web in Florida in 2013. (Undisputed Facts ¶¶ 1, 2).

6. Boost Web's Articles of Incorporation list Lisa Albert as the registered agent, incorporator, and sole "initial officer(s) and/or director(s)." (Undisputed Facts ¶ 4).

7. Florida Secretary of State reports for each year from 2018 to 2021 list Lisa Albert as the "current registered agent" and "officer/director," and she signed each of those reports as "P." (Undisputed Facts ¶ 5).

8. There are no Shareholders of Boost Web. (Trial Tr. Day 1 53:18-19). Lisa's testimony established that there was no issued stock for Boost Web and that she does not possess any stock certificates or any stock in recorded form. (Trial Tr. Day 1 97:20-98:5). No shares were ever issued for Boost Web. (Trial Tr. Day 2 26:9-19). Additionally, no president or officers were ever elected. (Trial Tr. Day 1 99:9-101:16).

9. Wayne often held himself out publicly as the President of Boost Web, such as on his Boost Web email signature block, which states "Wayne Orkin, President." (Trial Tr. Day 1 90:19-25).

10. Lisa signed a lease agreement for office space for Boost Web in 2013 as "Lisa Albert for Wayne Orkin." (Undisputed Facts ¶ 6).

11. Lisa opened Boost Web's checking account at Wells Fargo Bank. Both Lisa and Wayne had signature authority over that account. (Undisputed Facts ¶ 7). Lisa was listed as the Owner/key individual and provided credit references to establish the Boost Web Wells Fargo account (Trial Ex. 10 at Albert0010135).

12. In addition, Lisa also dedicated her own Capital One credit card to pay Boost Web expenses and provided a card to Wayne to charge expenses to that Capital One credit card account. (Undisputed Facts ¶ 8). Wayne used his signature authority on the Boost Web Wells Fargo account to pay the Capital One card balances. (Undisputed Facts ¶ 9).

13. Lisa testified that there was no agreement as to the allocation of Boost Web profits and her compensation was to be discussed with Wayne once Boost Web reached profitability. (Trial Tr. Day 1 73:2-12). Likewise, Wayne testified there was no agreement by which Boost Web would pay him anything nor any agreement that he could use Boost Web funds for his personal or other business expenses. (Trial Tr. Day 2 11:10-16 ("no agreement"); Day 2 101:9-11 (no conversations on how money could be spent)).

14. Lisa never took out any of Boost Web's revenue for income for herself and there is no evidence that she ever received any compensation for her work for Boost Web. (Trial Tr. Day 1 73:15).

### A.III.  BOOST WEB AND CARDCONNECT

15. Prior to Boost Web's formation, PTMS (controlled by Wayne) was an agent for FTS. (Undisputed Facts ¶ 10).

4

16. In 2013, FTS rebranded as CardConnect, which became an in-house independent sales organization of Fiserv, Inc. ("Fiserv") responsible for acquiring agents, like Pass Thru, to sell credit card processing products and services to merchants. (Undisputed Facts ¶ 11).

17. At all times relevant to this dispute, Wayne was Boost Web's primary point of contact with CardConnect. (Undisputed Facts ¶ 12).

18. In January 2014, Wayne notified CardConnect that he no longer wanted residuals from PTMS deposited into PTMS's account and sought to arrange deposits to a "company [with] change of ownership." (Trial Ex. 12).

19. While the reason motivating the creation of Boost Web remains disputed, Wayne testified that he created Boost Web because Bank of America unilaterally closed his PTMS account (Trial Tr. Day 1 184:22-185:20).

20. Accordingly, Wayne requested that Lisa prepare and sign an Agent Information Sheet for Boost Web, including its Wells Fargo account information. (Trial Ex. 11).

21. On or about January 24, 2014, PTMS, FTS, and Boost Web entered into a Consent to Assignment Agreement. (Trial Ex. 13; Undisputed Facts ¶ 13).

22. On its face, the Consent to Assignment Agreement contemplates identification of "Merchants Assigned" by a Schedule A, which was left blank. (Trial Ex. 13).  While the Agreement stated that it applied to residuals for the unidentified Merchants Assigned, it also provided that "Assignor [PTMS] wishes to assign to the Assignee [Boost Web] all right title and interest to residuals and compensation under the Assignor ISO Agreement to the Assignee." (Id.) Nothing on the face of the Assignment Agreement reserves or "assigns" residuals to PTMS. (Id.)

23. Wayne signed the Consent to Assignment Agreement only once but did not indicate whether he was signing as PTMS or Boost Web. Laith Yaldoo signed on behalf of FTS/CardConnect. (Trial Ex. 13; Trial Tr. Day 2 63:19-66:19).

24. As Wayne admitted, the purpose of the Consent to Assignment Agreement was to "transfer revenue from Pass Thru Merchant Services over to the Boost operating account." (Trial Tr. Day 2 64:4-7). Yaldoo confirmed this understanding. (Trial Tr. Day 2 167:17-168:22 ("whatever he has in his residual report he wanted to move")).

25. The parties dispute whether the Consent to Assignment Agreement applies only to those merchants contracted to FTS by PTMS prior to the signing of the agreement on January 24, 2024, or to all merchants, including those contracted after that date.

26. Paragraph 14 of the Consent to Assignment Agreement states: "[I]f the Assignor and Assignee agree in a writing signed by both to the applicability of this agreement to new and additional merchant accounts referred by Assignor after the effective date, FTS shall consider such new and additional merchant accounts as encompassed by the terms of this agreement." (Trial Ex. 13 ¶ 14).

27. In practice, it is undisputed that all residuals from credit card transactions for all merchants originated by PTMS before the assignment and all merchant accounts originated after the assignment were deposited in the Boost Web Wells Fargo account from January 2014 until April 2021. (Undisputed Facts ¶ 14).

28. From 2014 to 2021, Boost Web reported all CardConnect deposits to the Boost Web Wells Fargo Account as revenue from CardConnect on its tax returns, with Wayne Orkin's input and Lisa's assent. (Undisputed Facts ¶ 14). Lisa reviewed and signed Boost Web's tax returns for 2014 to 2021. (Undisputed Facts ¶ 15).

### A.IV.   LISA REVOKES WAYNE'S ACCOUNT ACCESS & WAYNE REDIRECTS THE RESIDUALS

29. In April 2021, Lisa received a notification that her Capital One personal credit card was beyond the credit limit and running a balance of about $26,000. She had provided Wayne authority to use that card for Boost Web expenses, but he was incurring costs faster than Boost Web revenue in the Wells Fargo account could cover. (Trial Day 1 128:19-25).

30. Concerned about Wayne's financial activity, on or about April 26, 2021, Lisa terminated Wayne's access her Capital One credit card and his signature authority on the Wells Fargo Boost Web bank account. She also stopped certain payments from the Wells Fargo account that Wayne had initiated. (Trial Day 1 129:1-130:9; Undisputed Facts ¶¶ 18, 19).

31. On April 29, 2021, Lisa Albert sent an email to partnercompliance@cardconnect.com regarding her concerns with Wayne Orkin's "fraudulent activities." (Trial Ex. 138). The email states that Lisa Albert is "President of Boost Web SEO" and that Boost Web "ha[s] been experiencing fraudulent activities with a Wayne Orkin, who may have attempted to either access, change, or otherwise alter any arrangements between you (First Data/Card Connect) and Boost Web SEO." (Id.) It further notes that "[t]his [sic] is currently a civil and criminal matter that is being pursued" and that "Wayne Orkin is not an authorized representative of Boost Web SEO and any such attempted activity by him will be further pursued in court." (Id.)

32. In response to Lisa's actions, around May 21, 2021, Wayne contacted CardConnect via an email to Laith Yaldoo with instructions to re-direct the assignments from residuals originating from PTMS (which were subject to the 2014 Consent to Assignment Agreement with Boost Web) to another company, MKY FTS Sales LLC ("MKY"). (Trial

Ex. 56; Undisputed Facts ¶ 20). Yaldoo is a former employee of CardConnect and Wayne's "long time friend." (Trial Ex. 56). At the time of the email, Yaldoo was the Managing Member of MKY and conducted business as an independent contractor for CardConnect. (Trial Ex. 65; Trial Day 2 138:13-139:14).

33. Wayne did not conduct the redirect correspondence from his Boost Web or PTMS email accounts but rather an account associated with OBANC, one of his other businesses. (Trial Ex. 56).

34. At the time of these actions, the monthly residuals from CardConnect amounted to about $35,000 to $50,000 a month. (Undisputed Facts ¶ 20).

35. On June 3, 2021, Wayne signed an agreement with Yaldoo redirecting the CardConnect residuals from the Boost Web Wells Fargo bank account to MKY, which were then transferred to another personal account controlled by Wayne. (Undisputed Facts ¶ 21; Trial Ex. 65). Wayne stated that the purpose of this change was "so that . . . Boost would not receive the revenues." (Trial Tr. Day 2 85:21-87:12) Wayne signed on behalf of PTMS. (Trial Ex. 65). Boost Web was not an independent party to the contract and is not mentioned in the agreement. (Id.).

36. The 2014 Consent to Assignment Agreement required any modifications to the agreement to be modified by a writing signed by all parties. (Trial Ex. 13 ¶ 14).

37. Lisa was not aware of the residual redirect agreement. She emailed CardConnect three times between May 26, 2021, and June 3, 2021, to inquire about missing residual payouts that she had been expecting to see deposited into the Boost Web Wells Fargo bank account on May 25, 2021, as the payouts were usually received on the 25th day of each month. (Trial Ex. 64).

38. On August 24, 2021, Boost Web sent a letter through counsel to the Executive Vice President and Chief Legal Officer of Fiserv asserting Boost Web's entitlement to the residuals and noting "what appears to be troubling conduct by certain employees at CardConnect, LLC in supporting redirection of funds from Boost Web by a former salesman, Wayne Orkin." (Trial Ex. 75). The letter concludes, "[I]f the Court agrees that Wayne embezzled these funds and discovery reveals that CardConnect personnel knowingly assisted Wayne in doing so, Boost Web will seek to hold CardConnect liable for any funds that it is unable to recover from Wayne." (Id.)

39. Starting in August 2021, CardConnect ceased paying residuals to MKY and has thereafter been holding in escrow residuals derived from merchants originated under the PTMS agent codes. (Undisputed Facts ¶¶ 23, 24).

40. CardConnect paid a total of $234,941.60 in residuals to MKY from April 2021 to August 2021 for merchants originated under PTMS that were previously paid to the Boost Web Wells Fargo account. (Undisputed Facts ¶ 22).

41. As of November 10, 2023, CardConnect was holding $943,557.97 in residual revenue in escrow. That number continues to grow over time. (E-mail from parties to Court (Nov. 10, 2023, 5:06pm EST)).

42. Neither Wayne nor PTMS reported any revenue from CardConnect from 2014 to the present on any tax filing. (Undisputed Facts ¶ 25).

## B.    PRINCIPAL CONCLUSIONS OF LAW

Count II: Defamation

1. Wayne asserts a defamation claim against Lisa for informing clients of Boost Web that he is not affiliated with Boost Web and is not an officer of Boost Web. (Joint Pre-Trial Mem., ECF No. 160, p. 3).

2. Lisa's defense to Count II is that she did not state to any client of Boost Web that Wayne was not affiliated with Boost Web and, even if she did, a statement that Wayne was not affiliated with Boost Web is not defamatory and a statement that he was not an officer of Boost Web is true. (Id. at 9).

3. To establish a defamation claim under Massachusetts law, a plaintiff must allege four elements: "(1) that the defendant made a statement, concerning the plaintiff, to a third party; (2) that the statement was defamatory such that it could damage the plaintiff's reputation in the community; (3) that the defendant was at fault in making the statement; and (4) that the statement either caused the plaintiff economic loss . . . or is actionable without proof of economic loss." Alharbi v. TheBlaze, Inc., 199 F. Supp. 3d 334, 351 (D. Mass. 2016) (quoting Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012)). Four types of statements are actionable without proof of economic loss, including "statements that charge the plaintiff with a crime." Id. (internal quotation marks omitted) (quoting Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 511 (Mass. 2003)).

4. In most cases, the statement must be false, and truth will constitute a defense. Id. (citing Ravnikar, 782 N.E.2d at 510 n.3). By statute, Massachusetts permits a plaintiff to recover for a truthful defamatory statement published in writing (or its equivalent) with actual malice, MASS. GEN. LAWS ch. 231, § 92, "except as confined by the requirements of the First Amendment to the United States Constitution." White v. Blue Cross & Blue Shield of Mass., 809 N.E.2d 1034, 1036 n.4 (Mass. 2004).

5.   The defamatory statement Wayne alleges Lisa made was the email she sent to CardConnect on April 29, 2021. (See Principal Findings of Fact ("PFF") ¶ 31).

6.   As to the first element of the defamation claim, Wayne proved that Lisa made a statement, concerning him, to some email address at Card Connect. (Trial Ex. 138). As to the second element, the Court finds that Lisa's statement that Wayne engaged in fraudulent activities and that he is not an authorized representative of Boost Web did not damage his reputation in the community. By his own evidence, even after the email was sent, Wayne continued to do business with CardConnect and was even able to redirect the Boost Web residuals to MKY with a simple request. As to the third element, Lisa clearly made the statement given that she sent it from her email address. However, as to the final element, the Court finds that Lisa's email neither caused Wayne economic loss nor constitutes an actionable statement without proof of economic loss.

7.   Wayne did not suffer economic loss as a result of Lisa's statement. The evidence shows that CardConnect did not respond to Lisa's email, continued to distribute residuals to Boost Web, and allowed Wayne to redirect the CardConnect residuals from Boost Web to MKY in June 2021. CardConnect's decision to put the residuals in escrow came as a result of this litigation, not as a result of any statement Lisa made.

8.   Wayne insists that Lisa's statement that "[t]his is currently a civil and criminal matter that is being pursued," (Ex. 138), constitutes a statement charging him with a crime. The Court disagrees. The statement is merely indicative of Lisa's truthful intent to take an action and does not rise to the level of charging Wayne with a crime. Therefore, the statement does not fall within the exceptions to showing economic loss.

9. Furthermore, the Court finds that Lisa's statements were materially true and that there is no evidence that she acted with actual malice. As a result, even if Wayne had met all of the elements of his defamation claim, Lisa has proven an affirmative defense.

10. Accordingly, the Court rules in favor of the Defendant as to Count II.

<u>Count IV: Breach of Fiduciary Duty</u>

11. Wayne alleges that Lisa owed him a fiduciary duty and breached her that duty by diverting Boost Web assets for her own personal use, failing to notify Wayne and involve Wayne in the preparation and filing of taxes, cutting off Wayne's access to the Boost Web Wells Fargo Account, and making false claims to clients concerning Wayne's status with Boost Web. (Joint Pre-Trial Mem., p. 4).

12. Lisa's defense to Count IV is that is that Wayne was not an officer or shareholder of Boost Web and that she did nothing in violation of her fiduciary duties to Boost Web. (<u>Id.</u> at 5-6).

13. When claims arise under diversity jurisdiction, "a district court will generally apply the choice-of-law provisions of the state in which the court sits." <u>Natale v. Espy Corp.</u>, 2 F. Supp. 3d 93, 102 (D. Mass. 2014). The Massachusetts Supreme Judicial Court ("SJC") has held that, "pursuant to the Massachusetts 'internal affairs' doctrine, the law of the state of incorporation applies to disputes over the internal workings of a corporation, including allegations that majority shareholders breached a fiduciary duty to shareholders." <u>Nahass v. Harrison</u>, 207 F. Supp. 3d 96, 102 (D. Mass. 2016) (citing <u>Harrison v. NetCentric Corp.</u>, 744 N.E.2d 622, 627-29 (Mass. 2001)). Boost Web is a Florida corporation. Therefore, Florida law, not Massachusetts law, applies to the breach of fiduciary duty claim.

14. Under Florida law, a plaintiff bringing a claim for a breach of fiduciary duty must show: "the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." Taubenfeld v. Lasko, 324 So. 3d 529, 537-38 (Fla. Dist. Ct. App. 2021) (quoting Gracey v. Eaker, 837 So. 2d 348, 353 (Fla. 2002)).

15. "Corporate directors and officers owe a fiduciary obligation to the corporation and its shareholders and must act in good faith and in the best interest of the corporation." Taubenfeld, 324 So. 3d at 538-39 (quoting Cohen v. Hattaway, 595 So. 2d 105, 107 (Fla. Dist. Ct. App. 1992)). Those owing a fiduciary duty "may not 'either directly or indirectly, in their dealings on behalf of the fiduciary beneficiary . . . , make any profit or acquire any other personal benefit or advantage, not also enjoyed by the fiduciary beneficiary, and if they do, they may be compelled to account to the beneficiary in an appropriate action.'" Id.

16. The evidence presented at trial showed that Boost Web did not have any shareholders. Wayne Orkin does not own any shares of Boost Web stock. In fact, no shares were ever issued for Boost Web. (PFF ¶ 8). Therefore, Wayne is not a shareholder and Lisa Albert only owed a fiduciary duty to the corporation of Boost Web, not to Wayne.

17. Additionally, contrary to Wayne's characterization of Lisa's actions, her decisions to remove Wayne's access to the Wells Fargo account and to direct CardConnect to cease payment of Boost Web's residuals to Wayne reflect an earnest effort to protect the corporation over which she served as director. Wayne was using Boost Web funds for all sorts of personal expenses or expenses for businesses other than Boost Web which had no benefit to the company presently or in the future. In essence, Lisa's actions protected the

corporation from conversion by an employee. Rather than breaching her fiduciary duty to Boost Web, she fulfilled it.

18. Accordingly, the Court rules in favor of the Defendant as to Count IV.

Count VI: Breach of Contract

19. Wayne alleges that he and Lisa had a contractual understanding developed through their discussions and years of a course of conduct that he would manage the business of Boost Web and she would serve in a minor accounting role. (Joint Pre-Trial Mem., p. 4). Wayne asserts that Lisa breached their agreement when she stopped payments from Boost Web's Wells Fargo account, removed Wayne as an authorized user of that account, and diverted money from Boost for her own personal use. (Id.)

20. Lisa's defense to Count VI is that there was no agreement that Wayne would be "president" of Boost Web or that he could use Boost Web funds for personal expenses unrelated to Boost Web. (Id. at 7).

21. "Massachusetts law determines the elements of the [breach of contract claim] because the case is properly before this Court based on diversity jurisdiction." Wagner v. Fed. Home Loan Mortg. Corp., 494 F. Supp. 3d 80, 85 (D. Mass. 2020). Under Massachusetts law, the elements of a breach of contract claim are that "there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." Squeri v. Mount Ida Coll., 954 F.3d 56, 71 (1st Cir. 2020) (quoting Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 39 (Mass. 2016)).

22. "In the absence of an express agreement, a contract implied in fact may be found to exist from the conduct and relations of the parties." Id. (quotations omitted). "To prove that an

implied contract was formed, a plaintiff must show 'that there was a benefit to the defendant, that the plaintiff expected the defendant to pay for that benefit, and that the defendant expected, or a reasonable person should have expected, that he or she would have to pay for that benefit.'" <u>Full Spectrum Software, Inc. v. Forte Automation Sys., Inc.</u>, 100 F. Supp. 3d 50, 57 (D. Mass. 2015) (quoting <u>T.F. v. B.L.</u>, 813 N.E.2d 1244, 1249 (Mass. 2004).

23. Whether implied or express, to create an enforceable contract, "there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." <u>Full Spectrum Software</u>, 100 F. Supp. 3d at 56 (quoting <u>Situation Mgmt. Sys., Inc. v. Malouf, Inc.</u>, 724 N.E.2d 699, 703 (Mass. 2000). It is not required that all terms of the contract be precisely specified; however, the parties must have an understanding beyond mere negotiation. <u>Id.</u> "[T]he failure to reduce uncertainties to definite terms [can be] fatal, particularly where parties have not yet formalized their negotiations or have left essential terms completely open." <u>Full Spectrum Software</u>, 100 F. Supp. 3d at 56 (quoting <u>Lafayette Place Assocs. v. Boston Redev. Auth.</u>, 694 N.E.2d 820, 825-26 (Mass. 1998).

24. As a preliminary matter, the evidence showed that there was no express agreement between Wayne and Lisa as to the allocation of Boost Web profits, no agreement as to compensation for either Wayne or Lisa, nor any agreement as to how Wayne or Lisa could use Boost Web funds. (PFF ¶ 13). Both parties agree that there was an understanding that Lisa's compensation was to be discussed with Wayne once Boost Web reached profitability. (<u>Id.</u>)

25. The Court acknowledges that there was a general understanding that Wayne would manage the day-to-day activities of the business; however, no implied contract was created due to

the lack of specificity as to the details of Wayne and Lisa's arrangement.. It was not established at trial that there was an agreement, implied or otherwise, that would have allowed Wayne to spend Boost Web funds for personal use. Furthermore, there was no agreement, implied or otherwise, that stipulated that Wayne would have unfettered access to the Boost Web Wells Fargo account or how Lisa might address unauthorized expenses incurred by Wayne.

26. As a result, the Court finds that there was no contract, implied or otherwise, that is specific enough to be enforceable. Wayne failed to present sufficient evidence to establish the existence of any of the essential terms he alleges that Lisa breached.

27. Accordingly, the Court rules in favor of the Defendant as to Count VI.

<u>Count VIII: Unjust Enrichment</u>

28. Wayne brings a claim for unjust enrichment against Lisa, alleging that she improperly retained funds owed to Boost Web and himself and diverted the money from Boost Web's Wells Fargo account for her own use. (Joint Pre-Trial Mem., p. 5).

29. Lisa's defense to Count VIII is that she withdrew the remaining funds from the Boost Web Wells Fargo account to pay off expenses Wayne charged against the Boost Web Capital One credit card and Wayne does not have standing to assert unjust enrichment on behalf of Boost Web. (<u>Id.</u> at 8).

30. To succeed on an unjust enrichment claim under Massachusetts law, a plaintiff must show: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value." <u>Tomasella v. Nestlé USA, Inc.</u>, 962 F.3d 60, 82 (1st Cir. 2020) (internal quotation marks

omitted) (quoting <u>Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.</u>, 552 F.3d 47, 57 (1st Cir. 2009), <u>decision clarified on denial of reh'g</u>, 559 F.3d 1 (1st Cir. 2009)); <u>Li v. Teikametrics, Inc.</u>, No. 21-10275-LTS, 2021 WL 7368819, at *1 (D. Mass. Aug. 20, 2021) (emphasis omitted).

31. As a preliminary matter, Wayne does not have standing to assert a derivative claim on behalf of Boost Web. In order for Wayne to have standing to pursue claims on behalf of Boost Web, he must demonstrate that he owned company stock at the time of the alleged wrongdoing and continues to own stock up to and through the litigation. FED. R. CIV. P. 23.1(b); <u>Wiley v. Stipes</u>, 595 F. Supp. 2d 179, 186 (D.P.R. 2009). The evidence presented at trial showed that Boost Web did not have any shareholders. Wayne does not own any shares of Boost Web stock, nor has he ever. In fact, no shares were ever issued for Boost Web. (PFF ¶ 8). Therefore, Wayne cannot assert a derivative claim for unjust enrichment on behalf of Boost Web.

32. Regarding Wayne's allegation that Lisa unjustly enriched herself from his funds, the evidence at trial showed that Lisa set up the Boost Web Wells Fargo account to receive funds and pay monies owed on behalf of Boost Web. (PFF ¶ 11). Furthermore, Lisa dedicated her own Capital One credit card to pay Boost Web expenses and provided a card to Wayne to charge expenses to that Capital One credit card account. (PFF ¶ 12). Wayne, at times, used his signature authority on the Boost Web Wells Fargo account to pay the Capital One card balances. (PFF ¶ 12). Finally, it was established at trial that Lisa has not received any compensation for her work for Boost Web. (PFF ¶ 14).

33. Wayne's unjust enrichment claim against Lisa fails on the first element: he never conferred a benefit upon Lisa. Wayne never paid Lisa and Lisa never took Boost Web money to pay herself.

34. Additionally, Lisa did not use the funds at issue for personal benefit. Rather, the monies were used to pay off expenses Wayne charged against the Boost Web Capital One credit card. As stated, Wayne admits that he himself would charge expenses to the card and use the Wells Fargo account to pay off those charges. (Undisputed Facts ¶ 9).

35. Because Wayne lacks standing to assert an unjust enrichment claim on behalf of Boost Web, and because he never conferred a benefit upon Lisa, his unjust enrichment claim must fail.

36. Accordingly, the Court rules in favor of the Defendant as to Count VIII.

Count IX: Injunctive Relief

37. Wayne seeks injunctive relief to stop Lisa from making defamatory statements and require her to reinstate his access to the Boost Web Wells Fargo account, records, taxes, and communications with clients. (Joint Pre-Trial Mem., p. 5).

38. The Court may issue an injunction if it finds the following:

"(1) that [a party] has suffered" – or  . . . will suffer – "an  irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the [parties], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Benchmark Techs., Inc. v. Tu, No. 22-10227-LTS, 2023 WL 8371973, at *2 (D. Mass. May 30, 2023) (quoting Glob. NAPs, Inc. v. Verizon New England, Inc., 706 F.3d 8, 13 (1st Cir. 2013)).

39. First, as stated above, the Court concludes that Lisa did not defame Wayne. Therefore, as to his request for an injunction to prevent her from making defamatory statements about him – he has failed to establish that he suffered or will suffer an "irreparable injury."

40. Second, as to his claim for an injunction to reinstate his access to company accounts, records, taxes, and communications with clients, the Court finds that Wayne has failed to meet his burden on the second element above. Monetary damages would certainly be adequate to compensate for those injuries – had Wayne met his burden on any of his claims.

41. Wayne has failed to establish the elements required for the Court to order an injunction.

42. Accordingly, the Court rules in favor of the Defendant as to Count IX.

## CONCLUSION

For the reasons stated above, the Court enters judgment in favor of Defendant, Lisa Albert, on all counts. Any injunctive and declaratory relief sought by Wayne Orkin is DENIED in light of the Court's decision.

*     *     *

## WAYNE ORKIN'S MOTION FOR RECONSIDERATION

Wayne has moved for the Court to reconsider its ruling in favor of Lisa on his defamation claim (Count II), [ECF No. 192].

A party may seek to alter or amend a judgment under Federal Rule of Civil Procedure 59(e). "Rule 59(e) relief is granted sparingly, and only when 'the original judgment evidenced a manifest error of law, if there is newly discovered evidence, or in certain other narrow situations.'" Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 930 (1st Cir. 2014) (quoting Glob. Naps, Inc. v. Verizon New England, Inc., 489 F.3d 13, 25 (1st Cir. 2007)). The First Circuit has held that "a motion for reconsideration is not the venue to undo procedural snafus or permit a party to advance

arguments it should have developed prior to judgment, nor is it a mechanism to regurgitate old arguments previously considered and rejected." Biltcliffe, 772 F.3d at 930 (internal citations and quotation marks omitted). Wayne has not put forth any basis for reconsideration and merely regurgitates his old arguments that this Court considered in full at trial and rejected.

Therefore, the motion for reconsideration is DENIED.

*     *     *

## INTERVENOR CASE: BOOST WEB'S CLAIM AGAINST WAYNE ORKIN

### A.     INTERVENOR FINDINGS OF FACT ("IFF")

In addition to the facts stated above, the Court adds the following:

#### A.I.     Additional Facts on Boost Web's Creation and the 2014 Consent to Assignment Agreement

1. Although Wayne testified that the creation of Boost Web was occasioned by Bank of America unilaterally closing his PTMS account (Trial Tr. Day 1 184:22-185:20), as of that time, he owed back taxes for 2008 through 2012. (Trial Tr. Day 3 99:21-103:3-8 (tax liens)).

2. The Consent to Assignment Agreement provided that the rights to all residuals arising from merchant accounts originated by PTMS *on or before* the date of the Agreement were to be paid to Boost Web. (Trial Ex. 13).

3. As Wayne admitted, all the residuals from merchants identified as PTMS or under the associated agent codes of ED40, PTHR19, or EK52 on the CardConnect monthly reports "would have been put into the Boost account," even residuals from merchants originated after the Consent to Assignment Agreement. (Trial Tr. Day 1 173:11-21 (explaining Trial Ex. 5); Day 3 79:24-80:2 ("Those are Boost Web [merchant] accounts.").

20

4. As part of the Consent to Assignment agreement, Wayne submitted an "Agent Information Sheet," signed by Lisa, that allowed for the ACH transfer of residuals from FTS to the Boost Web bank account. (Trial Tr. Day 2 67:21-68:15).

5. From CardConnect's perspective, upon the execution of the Consent to Assignment Agreement, PTMS and Boost Web were one and the same. (Nicholson Dep. 157:23-158:3). Thereafter, CardConnect understood that Lisa was the principal of Boost Web and Wayne was the primary contact. (Nicholson Dep. 37:4-38:16).

6. Wayne's interpretation of paragraph 14 of the Consent to Assignment Agreement (that the Agreement split merchant accounts between pre-assignment and post-assignment originations), is not supported by CardConnect because CardConnect does not split merchants originated by the same agent. (Nicholson Dep. 130:7-19, 130:21-131:8). CardConnect's interpretation was that the Consent to Assignment Agreement applied to all merchant accounts originated both before and after the assignment. (Nicholson Dep. 43:23-44:22).

## A.II.   Wayne's Role at Boost Web

7. Wayne ran all of the day-to-day business affairs of Boost Web. (Trial Tr. Day 1 115:7-17; Day 5 121:2-23).

8. Lisa assisted with annual tax filings and some banking matters, with direction from Wayne and Boost Web's accountants. (Trial Tr. Day 1 66:24-65:4; 76:5-7).

9. At Wayne's direction, Lisa sent checks out for Boost Web business, set up the Boost Web voicemail to go to Wayne, and set up a virtual office for Boost Web. (Trial Tr. Day 1 87:10-88:18; Day 2 9:6-7).

10. Wayne generated all of Boost Web's business. (Trial Tr. Day 1 65:24-66:1).

11. Wayne used referrals, relationships, as well as marketing in order to contract merchants for merchant processing. (Trial Tr. Day 1 158:1-5).

12. Wayne managed the merchants he originated for CardConnect through the CardConnect CoPilot system. (Nicholson Dep. 38:10-14; Trial Tr. Day 3 113:15-115:3)

13. Within the CoPilot system, all of the accounts that deposited residuals into the Boost Web Wells Fargo account were under PTMS. (Nicholson Dep. 38:17-39:1; Trial Tr. Day 3 115:16-17).

14. Wayne maintained the merchants that deposited residuals to Boost Web, providing customer service when they had connectivity issues, issues with terminals, gateways, pricing, and/or the merchant processor. (Trial Tr. Day 1 163:2-7; Day 2 131:12-15; 164:5-8)

15. The companies Boost Web did business with, including FTS and CardConnect, always interacted with Wayne. (Nicholson Dep. 39:3-5; Trial Tr. Day 2 164:1-9).

**A.III.   Wayne's Use of Boost Web Funds**

16. Lisa testified that there was no agreement as to allocation of Boost Web profits and her compensation was to be discussed with Wayne once Boost Web reached profitability. (Trial Tr. Day 4 130:8-17).

17. Likewise, Wayne testified there was no agreement by which Boost Web would pay him anything nor any agreement that he could use Boost Web funds for his personal or other business expenses. (Trial Tr. Day 2 11:10-16 ("no agreement"); Day 2 101:9-11 (no conversations on how money could be spent); Day 5 122:3-7 (no salary or commissions)).

18. Both Wayne and Lisa's testimony made evident that Wayne indiscriminately used Boost Web funds for both business and personal expenses and later looked at account statements

to designate certain expenses as personal or business before sending those statements to the Boost Web accountant. Boost Web regularly declared Wayne's expenditures as "R&D" (Research and Development) expenses, even for transactions which Wayne was unable to justify as a Boost Web expense. (Trial Tr. Day 3 152:6-158:1).

19. For example, Wayne used Boost Web funds to write a $25,000 check to a company called Mainely Processing that sold CBD and hemp-related products. (Trial Tr. Day 3 152:6-154:2). In return, Wayne received hemp inventory. When asked whether the $25,000 was an "investment," Wayne responded "No," and stated that he did not remember what he did with that hemp inventory. When asked how the $25,000 purchase of hemp products benefitted Boost Web, Wayne replied "I don't remember it. It was - - there had to be some benefit to the company, I would assume." (Trial Tr. Day 3 154:3-154:15).

20. Wayne regularly used Boost Web funds to conduct business with other entities he was seeking to invest in or even start as his own business – entities which had no connection or benefit to Boost Web. As a rationale for this conduct, Wayne stated, "[m]e being Boost, as I understood it, allowed me to do just about anything I wanted." (Trial Tr. Day 3 154:3-154:15).

21. When Wayne did not provide receipts, Boost Web's accountant prepared and filed a Form 1099 for him for 2020 that reflected that Wayne paid himself $211,167.68 of Boost Web funds for which he could not document a Boost Web expense. (Trial Ex. 29; Trial Tr. Day 3 52:5-53:5; Day 4 21:4-26:9 (including dental work example)).

22. For 2021, Boost Web requested through counsel Wayne's documentation for Boost Web business expenses, which Wayne refused to provide, and Boost Web's accountant issued

him a Form 1099 for 2021 in the amount of $192,660.23. (Trial Tr. Day 4 26:11-29:2 (calculation); Trial Ex. 41 at 1).

23. Besides the ballooning balance that Wayne ran up on Lisa's personal credit card, (Trial Exs. 49 & 50; Trial Tr. Day 4 149:20-151:4), Lisa terminated Wayne's signature authority on the Boost Web Wells Fargo Account because she had received notices that the account was overdrawn due to checks issued by Wayne. (Trial Exs. 51 & 52; Trial Tr. Day 4 151:5-152:10).

24. When Lisa terminated Wayne's authority on the Wells Fargo account, she withdrew the bulk of the remaining funds to be able to pay off Wayne's charges on her credit cards as they became due. (Undisputed Facts ¶ 19; Trial Tr. Day 4 154:23-156:9).

25. Given the timing of the residual redirect agreement that redirected Boost Web's residuals to MKY, the Court concludes that Wayne's actions were in retaliation to Lisa shutting him out of the Wells Fargo accounts and her email to CardConnect notifying it of Wayne's potential fraudulent activities. Lisa terminated Wayne's access to the Wells Fargo account on or about April 26, 2021. Lisa sent her email to CardConnect on April 29, 2021. (Trial Day 1 129:1-130:8; Undisputed Facts ¶ 17). Wayne contacted Laith Yaldoo around May 21, 2021 to initiate the residual redirect. (Trial Ex. 56; Undisputed Facts ¶ 20). Wayne and his father, Arthur Orkin, sued Lisa and her son Ian on May 28, 2021. (ECF No. 1). The residual redirect agreement was executed on June 3, 2021. (Trial Ex. 65).

26. When the residuals were redirected to MKY, MKY then deposited some of the redirected funds in Arthur Orkin's personal account, which Wayne controlled. This resulted in commingling of Boost Web funds with other funds. (Undisputed Facts ¶ 22; Trial Tr. Day 2 199:16-200:2 (Yaldoo testimony); Day 3 167:13-168:2 (received roughly $150,000); Day 3 171:14-22 (Arthur Orkin's account).

**B.**     **INTERVENOR CONCLUSIONS OF LAW[2]**

1. The Court applies Ohio law with respect to the interpretation of the Assignment Agreement, as expressly provided therein (Trial Ex. 13 ¶ 17).

2. Under Massachusetts' internal affairs doctrine, Florida law applies to Boost Web's conversion claim given that Boost Web was incorporated in Florida. Natale, 2 F. Supp. 3d at 102.

**B.I.**     **ALL CARDCONNECT RESIDUALS BELONGED TO BOOST WEB**

3. As a preliminary matter, the parties dispute whether the Consent to Assignment Agreement assigned only residuals arising from merchant accounts originated by PTMS on or before that Agreement or whether the Agreement assigned all such residuals, including those originated after the signing of the Agreement.

4. Again, at issue is paragraph 14 of the Consent to Assignment Agreement, which states:

"if the Assignor [Pass Thru Merchant Services] in a writing signed by both to the applicability of this Agreement to new and additional merchant accounts referred by Assignor after the Effective Date, FTS shall consider such new and additional merchant accounts encompassed by the terms of this Agreement." (Trial Ex. 13 ¶ 14).

5. Prior to trial, it was unclear what the parties intended by the language in paragraph 14, specifically regarding the meaning of "new and additional merchant accounts *referred by the Assignor* after the Effective Date . . . ." (Trial Ex. 13 ¶ 14 (emphasis added)).

6. Although new merchants Wayne recruited were filed under PTMS's agent code in CoPilot (Intervenor Findings of Fact ("IFF") ¶ 12), in recruiting those merchants, Wayne acted for

---

[2] Any Conclusions of Law stated herein that are, in whole or in part, Findings of Fact, are also made Findings of Fact.

Boost Web. Wayne testified that he originated new merchant accounts for residuals to be paid to Boost Web and did so by entering information on CardConnect's CoPilot internet portal. (Trial Tr. Day 5 152:8-153:13 (explaining Trial Ex. 5)).

7.  To CardConnect, after the Consent to Assignment Agreement, Wayne ceased operating as PTMS and his business with CardConnect was now to be conducted through Boost Web. (Nicholson Dep. 44:24-45:8).

8.  Wayne himself stated that PTMS did no business after assigning its portfolio to Boost Web (Trial Tr. Day 3 82:19-83:11). Therefore, it is unclear how PTMS could have originated new merchants outside of the Consent to Assignment Agreement.

9.  To the extent the language of paragraph 14 applied to new and additional merchant accounts originated by Wayne while he was working for Boost Web, the Court finds that the Consent to Assignment Agreement is ambiguous.

10. "When the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement give the plain language special meaning, extrinsic evidence can be used to ascertain the intent of the parties." Campbell v. 1 Spring, LLC, 155 N.E.3d 186, 191 (citing Drs. Kristal & Forche, D.D.S., Inc. v. Erkis, No. 09AP-06, 2009 WL 3465916, at *4 (Ohio Ct. App. Oct. 27, 2009)).

11. "Terms in a contract are ambiguous if their meanings cannot be determined from reading the entire contract, or if they are reasonably susceptible to multiple interpretations." First Nat'l Bank of Pennsylvania v. Nader, 89 N.E.3d 274, 284 (Ohio Ct. App. 2017).

12. Contractual ambiguities may also arise when information is missing from a contract. See Starr v. Ohio Dep't of Com. Div. of Real Est. & Pro. Licensing, No. 20AP-47, 2021 WL 2710381, at *9 (Ohio Ct. App. June 30, 2021) ("failure to include the address

and price terms in the contract rendered the contract ambiguous and extrinsic evidence could be considered to explain what the parties intended the missing terms to state"); <u>see</u> <u>Young v. Louisville Title Agency, Inc.</u>, No. 91WD097, 1993 WL 5565, at *4 (Ohio Ct. App. Jan. 15, 1993).

13. As the Court has determined that the Consent to Assignment Agreement is ambiguous, it must now determine the parties' intent. <u>Envision Waste Servs., LLC v. Cnty of Medina</u>, 83 N.E.3d 270, 276 (Ohio Ct. App. 2017); <u>Michael A. Gerard, Inc. v. Haffke</u>, No. 98488 2013 WL 267296, at *3 (Ohio Ct. App. Jan. 24, 2013).

14. Under Ohio law, the Court seeks to determine the parties' intent from, among other things, the "acts by the parties that demonstrate the construction they gave to their agreement." <u>Envision Waste Servs.</u>, 83 N.E.3d at 276.

15. The parties' practical construction may be considered by the court as an aid to its construction when the contract is ambiguous, uncertain, doubtful, or where the words are susceptible to more than one meaning, or when a dispute has arisen between the parties after a period of operation under the contract. <u>St. Marys v. Auglaize Cty. Bd. Of Comm'rs.</u>, 875 N.E.2d 561, 568-69 (Ohio 2007) (to resolve ambiguities, court looked to practical construction by the parties).

16. The purpose of the Consent to Assignment Agreement was to transfer all residual revenues from the PTMS account to Boost Web's operating account. (PFF ¶¶ 18, 19, 24, 27; IFF ¶¶ 2, 3).

17. Additionally, Wayne never asserted at the time of the Consent to Assignment Agreement – or at any time prior to this litigation – that the rights to residuals from merchant accounts that he originated and assigned to Boost Web after the Assignment Agreement really

belonged to him or PTMS. (Trial Tr. Day 3 108:22-109:1). To the contrary, Wayne admitted that he consented and caused residuals from all merchant accounts originated after the Assignment Agreement to be paid by CardConnect to Boost Web. (Trial Tr. Day 3 112:25-115:25; Day 3 128:1-20). And so, Wayne's own conduct indicates that all PTMS residuals were assigned to Boost Web.

18. Further as CardConnect noted, the practice of the parties confirmed that the residuals from all merchants originated after the Assignment Agreement were considered part of the rights assigned to Boost Web. (Nicholson Dep. 124:17-125:1).

19. Accordingly, the Court finds that all residuals paid by CardConnect for merchant accounts originated under the PTMS agent codes belong to Boost Web, regardless of whether the merchant accounts were originated before or after the Consent to Assignment Agreement.

**B.II.**   **WAYNE ORKIN IS LIABLE FOR CONVERSION OF BOOST WEB FUNDS**

20. Boost Web contends that Wayne converted funds in two ways: first, through the redirection of CardConnect residuals to MKY and second, through his usurpation of Boost Web funds for personal expenses.

21. Under Florida law, to establish a conversion claim for money, a plaintiff must show "(1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for return of the money and a refusal to do so." U.S. v. Bailey, 288 F. Supp .2d 1261, 1264 (M.D. Fla. 2003).

22. "The generally accepted rule is that demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made."

IberiaBank v. Coconut 41, LLC, 984 F. Supp. 2d 1283, 1308 (M.D. Fla. 2013), aff'd, 589 F.App'x 479 (11th Cir. 2014) (internal quotations and citation omitted). "But while a demand and refusal constitute evidence that a conversion has occurred, it is unnecessary to prove a demand and refusal where the conversion can be otherwise shown." Id.

23. Under Florida law, "[f]or money to be the object of conversion there must be an obligation to keep intact or deliver the specific money in question, so that money can be identified." Gasparini v. Pordomingo, 972 So. 2d 1053, 1056 (Fla. Dist. Ct. App. 2008) (internal quotation marks and citations omitted). See also Walker v. Figarola, 59 So. 3d 188, 190 (Fla. Dist. Ct. App. 2011) (same). However, the "specific fund" or "identification" requirement is one that is "intended to apply in situations where there is a contractual obligation to pay money to ensure that a plaintiff is not transforming a contract dispute into a tort claim." eCapital Com. Fin. Corp. v. Hitachi Cap. Am. Corp., No. 21-cv-60152, 2022 WL 1320405, at *10 (S.D. Fla. May 2, 2022) (internal citations omitted) (denying defendant's motion for summary judgment); see SOS Furniture Co., Inc. v. Salem, No. 6:18-cv-898, 2019 WL 279887, at *4-5 (M.D. Fla. Jan. 22, 2019) (denying motion to dismiss plaintiff's first conversion claim because plaintiff identified a specific and identifiable fund – i.e. "the Embezzled funds").

24. Good faith is not a defense upon showing that the defendant took property belonging to the plaintiff. World Cellphones Distribs. Corp. v. De Surinaamsche Bank, N.V., 357 So. 3d 225, 229 (Fla. Dist. Ct. App. 2023) (conversion is established by defendant taking personal property of plaintiff even "upon a mistaken belief as to the legal right of the defendant to the converted property") (quoting Ciamar Marcy, Inc. v. Monteiro Da Costa, 508 So. 2d 1282, 1283-84 (Fla. Dist. Ct. App. 1987) (upholding finding of conversion)).

25. Framing the facts in terms of the elements required for conversion, the specific and identifiable money comes from 2 sources: (1) the $234,941.60 in CardConnect residuals that Wayne had redirected from Boost Web to MKY that would have been otherwise payable to Boost Web from April 2021 to August 2021 (PFF ¶ 40); and (2) Wayne's unaccounted-for personal expenses in 2020 and 2021, for which Boost Web issued Form 1099s in the amounts of $211,167.68 (2020) and $192,660.23 (2021) (IFF ¶¶ 21, 22).

26. Boost Web had an immediate right to possess those funds, as indicated above. As the Court will detail below, Wayne's redirection of the residuals to MKY was an unauthorized act that deprived Boost Web of that money. The Court finds that as to the residual redirect, the final element of demand for repayment does not apply here as "the act complained of amounts to a conversion regardless of whether a demand is made." IberiaBank, 984 F. Supp. 2d at 1308. Further, Wayne's professed good faith, mistaken belief that he could do with Boost Web funds as he pleased, is irrelevant. See Ciamar Marcy, Inc., 508 So. 2d at 1283-84.

### B.II.a.   Wayne Did Not Have Authority to Convert Boost Web Funds Through the Redirection of CardConnect Residuals

27. The truly complicating factor in this case is that Wayne Orkin indisputably ran Boost Web's day-to-day operations, generated all of its revenue, maintained relationships with merchants, and was viewed by others doing business with him as the face of Boost Web. (IFF ¶¶ 7-15). At the same time, Wayne has no claim of ownership of Boost Web on paper. Lisa Albert incorporated Boost Web and listed no other officers or shareholders, opened the Boost Web Wells Fargo account, used her personal credit card (and put her own credit

30

worthiness on the line) for Boost Web, and signed and filed all Boost Web tax returns. (PFF ¶¶ 5-8, 11, 12). Wayne may have been the boots on the ground, but Lisa was the officer above accountable for all of the risk.

28. The key question before the Court is whether Wayne had actual authority to redirect the Boost Web residuals to MKY. Just as with the Consent to Assignment Agreement in 2014, he signed only once, except with the residual redirect, he did not indicate whether he was signing on behalf of Boost Web or PTMS. (PFF ¶¶ 23, 35). In 2014, Wayne signed on behalf of PTMS, but all parties agree that he had authority to bind Boost Web as well. Did he have the same authority to bind both PTMS and Boost Web with a single signature to redirect the residuals to MKY in 2021?

29. As stated previously, under Massachusetts' internal affairs doctrine, Florida law governs Boost Web's corporate governance and internal affairs since Boost Web is a Florida incorporation. Natale, 2 F. Supp. 3d at 102. Those affairs include "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders." Mariasch v. Gillette Co., 521 F.3d 68, 72 (1st Cir. 2008). The issue here is the scope of Wayne's actual authority to act as an officer of Boost Web and whether he exceeded his authority in executing the residual redirect agreement. Therefore, Florida law on agency applies.

30. First, the principal at issue is Boost Web. In actuality, a corporation is a legal entity that is directed by people. "The power to operate and control a corporation resides with its board of directors." Fla. State Oriental Med. Ass'n v. Slepin, 971 So. 2d 141, 146 (Fla. Dist. Ct. App. 2007). Lisa incorporated Boost Web and is the only person listed as the registered agent, incorporator, and sole "initial officer(s) and/or director(s)." (PFF ¶¶ 6, 7). Therefore,

Lisa in this circumstance acts as the principal and would be responsible for delegating authority to Wayne.

31. An agent's authority can be actual or apparent. Actual authority "exists when a principal delegates authority to an agent by expressly authorizing the agent to do a delegable act." Fla. Power & Light Co. v. McRoberts, 257 So. 3d 1023, 1026 (Fla. Dist. Ct. App. 2018) (citing Richard A. Lord, 12 Williston on Contracts § 35:10 (4th ed.); see also Restatement (Third) of Agency § 2.01 (Am. Law Inst. 2006). To establish actual authority, a plaintiff must prove: "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." Fla. Power & Light Co., 257 So. 3d at 1026 (citing Goldschmidt v. Holman, 571 So. 2d 422, 424 n.5 (Fla. 1990)).

32. While Lisa and Wayne agree that Wayne had general implied authority to conduct day-to-day affairs of the company, nothing in the record establishes that Wayne had actual authority from Boost Web or Lisa to redirect residuals away from Boost Web. Both Lisa and Ian Albert testified that Boost Web never authorized Wayne to redirect residuals away from Boost Web. (Trial Tr. Day 4 32:3-6 (Ian Albert testimony); Day 4 35:24-36:1 (same); Day 4 134:6-15 (Lisa Albert testimony); Day 4 161:2-8 (same)). Nor did Wayne introduce any evidence that he or PTMS reserved the right to redirect assigned residuals away from Boost Web when he signed the Consent to Assignment Agreement. As the first element is not met, Wayne lacked actual authority to redirect the residuals from Boost Web to MKY.

33. Apparent authority is established only when the principal creates the appearance of an agency relationship. Fla. State Oriental Med. Ass'n, 971 So. 2d at 145 (citation omitted). Apparent authority "does not depend on representations by the person claiming to be an

agent or on the subjective belief of the person dealing with the purported agent." Id. (citation omitted).  Instead, apparent authority is "based entirely on the acts or omissions of the principal." Id. Apparent authority is found only when a principal "knowingly tolerates or permits" the agent's authority or when the principal "by it actions or words holds the agent out as possessing [authority]." Id.

34. For both apparent and actual authority, an agent cannot bind a principal solely through his own actions. Fla. Power & Light Co., 257 So. 3d at 1027. Additionally, after an action is taken the principal must ratify the agent or the authority of the agent to act. Id.

35. In Perper v. Sonnabend, 221 F.2d 142 (5th Cir. 1955), the Fifth Circuit applied Florida law and found that a plaintiff failed to establish that a hotel manager had actual or apparent authority to enter into a real estate sales contract. Id. at 144. In Perper, the hotel manager had explicitly informed the broker that he had authority to enter the contract, but the court reasoned that the manager's statements alone did not suffice to establish his authority and the principal had not made any representations to the broker that would establish apparent authority. Id. Further, the principal was not bound by the actions of the manager because the principal never ratified the agreement. Id. at 145.

36. The same conclusion applies here. Wayne's only claim to authority is that he told CardConnect that he was the president of Boost Web. However, Wayne, like the hotel manager in Perper, cannot establish authority through his own words or actions. Neither Boost Web nor Lisa made any statements to CardConnect that would give Wayne authority to bind Boost to the residual redirect agreement.

37. In 2014, Boost Web ratified the original Consent to Assignment Agreement through its conduct in accepting the residual payments. See Domino v. Nielsen, No. 2016CA007959,

33

2020 WL 1951753, at *2 (Fla. 15th Cir. Ct., Mar. 16, 2020) (holding a principal "may ratify an agent's [] actions which would have otherwise been outside the scope of its authority by accepting the benefit of the agent's actions.") (internal quotation marks omitted). However, in 2021, Boost Web not only failed to ratify the residual redirect agreement, it explicitly disclaimed the agreement when the company's counsel sent a letter to CardConnect revoking Wayne's authority and contesting the redirection of the residuals. (Trial Exs. 74 & 75).

38. Further, even if Wayne could establish that he had authority to act on behalf of Boost Web, he exceeded that authority when he redirected the residuals. The Supreme Court of Florida has held that "an agent is a fiduciary with respect to the matters within the scope of his agency." <u>Fisher v. Grady</u>, 178 So. 852, 860 (Fla. 1937). An agent has a duty to "act solely for the benefit of the principal" and may not "act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto." <u>Id.</u>

39. Wayne violated his duty and exceeded any authority by redirecting Boost Web's legally-entitled residuals in retaliation for Boost Web's actual president – Lisa – attempting to prevent him from converting company funds. Moreover, Wayne redirected the funds to a "long time friend['s]" company, MKY, which then, acting at Wayne's request, forwarded the funds to Wayne's father's personal account over which Wayne maintained control. (PFF ¶ 35; IFF ¶ 26). The secretive and convoluted nature of Wayne's actions belie an intent to conceal his actions from Boost Web, further adding to evidence that he was not acting for its benefit. Instead, Wayne acquired a private interest of his own that was directly antagonistic to Boost's interests. <u>See</u> <u>Fisher</u>, 178 So. at 860.

40. Accordingly, Wayne did not have authority to bind Boost Web to the 2021 residual redirect agreement and his attempt to do so supports a finding that he acted to convert Boost Web funds.

### B.II.b.    <u>Wayne's Usurpation of Boost Web Funds for Personal Expenses Constituted Conversion</u>

41. Withdrawing money from an account and exercising wrongful dominion and control over the money is an act of conversion. <u>Allen v. Gordon</u>, 429 So. 2d 369, 371 (Fla. Dist. Ct. App. 1983); <u>Masvidal v. Ochoa</u>, 505 So. 2d 555, 556 (Fla. Dist. Ct. App. 1987) (conversion can be asserted where a party embezzles funds from an escrow account).

42. Wayne admitted to using funds from the Boost Web Wells Fargo account to pay his personal expenses, such as dental work and clothing purchases, and payments for the benefit of his other enterprises, such as CBD or hand sanitizer distribution. (Trial Tr. Day 2 102:3-103:19 (dental work); Day 2 108:3-109:10 (hand sanitizer business); Day 3 56:9-57:7 (did not get Lisa's approval)).

43. Wayne also admitted to using funds from the Boost Web Wells Fargo account to pay his and Boost Web credit card bills for personal and other family expenses and other business expenses. (Trial Tr. Day 2 91:10-25 ("the company paid them"); Day 2 107:8-17 (company paid personal credit card); Day 3 120:15-122:25 (paid Arthur Orkin's expenses); Day 3 147:18-148:12 (Nordstrom, Macy's)).

44. For example, the Wells Fargo Bank statement dated March 31, 2021, reflected checks issued by Wayne to Ana Barbosa (his father's housekeeper), PAS Truck + Trailer, Simos Imports, LLC, and Coastal Pay International, all signed by Wayne, as well as various electronic transfers initiated by Wayne. (Trial Ex. 48).

45. The Wells Fargo Bank statement dated April 30, 2021, reflected checks issued to PAS Truck + Trailer, Ido Moskowitz, and Zach Bearne, all signed by Wayne, as well as electronic transfers initiated by Wayne to pay credit card balances. (Trial Ex. 55).

46. Boost Web's bank account statements revealed that Wayne had written substantial checks to Mainely Processing to purchase CBD products and PAS Trucking + Trailer and Simoes Imports. (Trial Ex. 47 at Albert000204, 205 (checks signed by Mr. Orkin)).

47. At trial, Wayne could not articulate how those payments had benefitted Boost Web. (Trial Tr. Day 3 152:6-154:15 (can't state Boost Web business purpose); Trial Tr. Day 4 29:3-30:7 (PAS Truck + Trailer and Simoes Imports has nothing to do with Boost Web business)). Instead, Wayne testified that he was using Boost Web funds to buy CBD from Mainely Processing for his other company, LS Distribution, because he could "do just about anything [he] wanted." (Trial Tr. Day 3 156:15-157:18).

48. Wayne also admitted that the Boost Web funds he paid to Simoes Imports had no business purpose for Boost Web. (Trial Tr. Day 3 162:16-163:20; Day 5 134:2-10 ("the company that I was doing business with")).

49. Lisa never gave Wayne permission to use Boost Web funds to pay Simoes Imports, PAS Truck + Trailer, Mainely Processing or for any purpose other than Boost Web expenses. (Trial Tr. Day 4 31:23-32:2 (Ian Albert testimony); Day 4 148:4-17 (Lisa Albert testimony)).

50. To the extent a demand for repayment is required under Florida law, Wayne admitted that Boost Web's accountant sought receipts to document Boost Web expenses. (Trial Tr. Day 3 46:14-24). Indeed, Ian Albert testified that he downloaded into a spreadsheet transaction records from the Boost Web checking and credit card accounts and Lisa's credit card

account, and provided that spreadsheet to Wayne to identify business expenses and personal expenses. (Trial Tr. Day 4 16:12-17:19).

51. As noted above, when Wayne did not provide receipts, Boost Web's accountant prepared and filed a Form 1099 for him for both 2020 and 2021 that reflected Wayne paid himself $211,167.68 (2020) and $192,660.23 (2021) of Boost Web funds for which he could not document a Boost Web expense. (IFF ¶¶ 21, 22).

52. Given Wayne's failure to document his expenses with receipts, this Court ordered him to account for all Boost Web funds that he spent from January 1, 2020, through June 15, 2023. (Stipulated Order for Accounting [ECF No. 157]). Wayne failed to do so for 2020 and 2021 in his sworn accounting statement or at trial. (Trial Ex. 76 (sworn accounting statement); Trial Tr. Day 3 68:11-14 (nothing for 2020); Day 5 169:1-170:13 (claims misreading of Court's order and estimating $100,000 in undocumented Boost Web expenses for 2020)).

53. Nothing in the record establishes that Wayne could rightfully use Boost Web funds to pay for his personal expenses or other business expenses to benefit himself.

54. As Wayne admitted in his verified complaint and at trial, Boost Web had an ownership interest in those funds at the time of Wayne's withdrawal of them as they were resident in Boost Web's Wells Fargo Bank account. (Complaint and Demand for Trial by Jury [ECF No. 5] ¶ 34; Trial Tr. Day 5 122:12-14 (Boost Web revenues went into Boost Web account); 157:2-159:7).

55. By paying $403,827.91 in his personal and unrelated business expenses from Boost Web's checking account, Wayne intentionally and wrongfully exercised control or dominion over Boost Web's funds. See Hulcher v. Secretary, Dep't of Corrs., No. 8:20-cv-552, 2023 WL

360478, at *1-5 (company treasurer's writing over 200 company checks made payable to cash or herself amounted to "classic embezzlement at the common law").

56. Accordingly, Boost Web was damaged by Wayne's use of Boost Web funds to pay his personal and business expenses in the amount of $403,827.91, which is what Boost Web's accountant calculated as Wayne's withdrawals or payments for expenses that were not for Boost Web business purposes in 2020 and 2021. See MBI Servs., LLC v. Apex Distrib. LLC, No. 21-CV-20975, 2023 WL 312899, at *3 (S.D. Fla. Jan. 19, 2023) ("[Plaintiff] MBI has sufficiently alleged, and demonstrated during the trial, that [individual defendants] are liable to [plaintiff] for $2,000,000 due to their conversion of the Funds.").

**B.III.    ALL FUNDS HELD BY CARDCONNECT SHOULD BE RELEASED TO BOOST WEB**

57. The Court finds by a preponderance of the evidence, that the residuals payable to Boost Web under the Assignment Agreement for April 2021 and thereafter belong to Boost Web.

58. Additionally, the residual redirect agreement executed by Wayne was not authorized by Boost Web and did not operate to terminate Boost Web's rights to receive residuals for all merchant accounts originated under the PTMS agent codes, which were assigned to Boost Web.

59. Accordingly, the disputed residuals being held by CardConnect and any future residuals payable under the Assignment Agreement belong to Boost Web and should be paid into

Boost Web's Wells Fargo account, into which CardConnect paid them without objection from January 2014 to April 2021,[3] or as directed by Boost Web.

60. Though CardConnect is not a party to this action, it is within the Court's authority to grant relief and enforce that grant against a nonparty to fully address "persons who are properly affected by [that relief], even if they are not parties to the action." Williams v. Devos, No. 16-11949-LTS, 2019 WL 7592345, at *1 (D. Mass. Aug. 8, 2019) (finding intervention untimely); FED. R. CIV. P. 71.

**B.IV.    <u>CONCLUSION</u>**

For the reasons stated above, the Court enters judgment as follows:

61. The Court rules in Boost Web's favor on Count I of the Intervenor Complaint for conversion and awards Boost Web $638,769.51 in damages against Intervenor-Defendant Wayne Orkin ($234,941.60 in residuals accrued from April 2021 to August 2021 and $403,827.91 in personal and unrelated business expenses from 2020 and 2021);

62. The Court declares that the funds being held by CardConnect representing residuals from merchant accounts payable to Boost Web since August 2021 belong to Boost Web; and

63. The Court awards Boost Web pre-judgment interest on all damages and all funds held by CardConnect in an amount to be calculated after entry of judgment.

SO ORDERED.

Dated: April 11, 2024

   /s/ Margaret R. Guzman
   Margaret R. Guzman
   United States District Judge

---

[3] CardConnect testified that the residuals were only being held "until the dispute could be resolved." (Nicholson Dep. 153:16-19).